150 P.3d 607 (2007)
State of WASHINGTON, Respondent,
v.
Trollers FLEMING, Appellant.
No. 33405-4-II.
Court of Appeals of Washington, Division 2.
January 17, 2007.
Rita Joan Griffith, Attorney at Law, Seattle, WA, for Appellant.
Kathleen Proctor, Pierce County Prosecuting Atty Office., Tacoma, WA, for Respondent.
PENOYAR, J.
¶ 1 Trollers Fleming appeals his second degree murder conviction arising from the shooting death of his brother, Yuseph Shabazz. Fleming claims error at trial because: (1) the detective commented on his guilt; (2) the detective commented on handcuffing Fleming when he turned himself in to police; and (3) the trial court allowed impermissible hearsay. Fleming also argues that his firearm enhancement was improper because the trial court did not have the statutory authority *608 to submit the question to the jury. Fleming raises numerous other issues in his pro se statement of additional grounds (SAG), but none have merit. We affirm the conviction and the sentence because Fleming has not demonstrated error.

FACTS
¶ 2 On the night of June 2, 2004, Yuseph Shabazz and his brother, Trollers Fleming, were driving back to Tacoma after taking Shabazz's wife to the airport. The two had been drinking earlier in the evening, and Fleming had driven extremely erratically on the way to the airport.
¶ 3 At about midnight, Pierce County Sheriff Deputy Carr heard a few "pops" and saw debris flying out the driver-side window of a car about six or eight car lengths behind him. 3 Report of Proceedings (RP) at 340. The car then sped up and flew off the road. Deputy Carr circled around, located the car, and found Shabazz lying in the driver seat. He had been shot five times in the face and neck and had no pulse. He was pronounced dead at the hospital later that night.
¶ 4 A K-9 unit tracked a scent from the passenger's side of the vehicle to an area where officers discovered a pair of boxer shorts with some bloodstains, a cigar, a roll of tape, and dried blood (on top of a chain link fence). DNA analysis later revealed that Shabazz's blood was on the shorts, but DNA fragments on the waistband showed that the shorts belonged to Fleming. The blood on the fence also belonged to Fleming.
¶ 5 Fleming's sister, Mary Sconyers, brought Fleming to the police a few days after the incident. The police advised Fleming of his rights, and then tape recorded his statement. Fleming stated that Shabazz was angry with him for his erratic driving on the way to the airport, and Shabazz then drove the pair back to Tacoma. Fleming claimed that Shabazz had grabbed Fleming's throat, began to choke him, and then pulled out Fleming's gun (which Fleming had given to him earlier that day), and pointed it at Fleming. The two struggled over the gun, but Fleming asserted that it did not go off until the car went off the road. He maintained that he did not realize Shabazz had been shot, and he ran only when he heard police sirens.
¶ 6 After Fleming made his statement to the police, they were able to obtain a search warrant for Sconyers' house. Fleming's gun was found there in the subsequent search.
¶ 7 The State charged Fleming with first degree murder. At a pretrial hearing, the trial court ruled that Fleming waived his rights knowingly, voluntarily, and intelligently, so his statement to the police was admissible. However, the State successfully brought a motion in limine to preclude Fleming from introducing his statement at trial. The trial court also denied Fleming's motion to exclude any reference to the incident as a "murder," but it agreed that Fleming could object whenever "murder" was used in an inflammatory manner. 1 RP at 82.
¶ 8 During trial, the State asked Detective Vold whether he had been "contacted regarding a murder." 4 RP at 594. Fleming objected, and the trial court overruled the objection. Detective Vold then responded that he was contacted regarding an "alleged homicide." 4 RP at 595.
¶ 9 Detective Vold also testified regarding information that he had received through conversations with Sconyers. Fleming objected twice on hearsay grounds, but the trial court overruled his objections.
Q [by State]: Okay. Was [Sconyers] able to provide any information that was useful to your investigation?
[Defense counsel]: Objection, Your Honor; hearsay.
THE COURT: Without divulging the information, that would be a yes or no answer.
THE WITNESS: Yes, she was.
Q [by State]: Did it lead you to the next step in your investigation?
[Defense counsel]: I am going to object in terms of hearsay.
[State]: Your Honor
THE COURT: We are getting close to something that would necessitate hearsay, *609 but I don't think we are quite there yet. I will overrule.
4 RP at 604.
¶ 10 Detective Vold then testified that Sconyers led him to Jasmine[1], Shabazz's wife, and that Jasmine gave him useful information about what happened before the incident.
¶ 11 Detective Vold stated that he put out a local bulletin identifying the third individual in the car (Fleming's name was not mentioned in testimony, on hearsay grounds). The individual was listed as a person of interest. Detective Vold did not get to speak with Fleming until he came to the Pierce County Sheriff's office on the morning of June 4. Detective Vold testified that, at this point, he placed Fleming in handcuffs. Fleming objected under ER 401, 403, and 404(b), but the trial court overruled the objection.
¶ 12 After a weekend recess, the State continued Detective Vold's direct examination. The following exchange took place:
Q: At some point, you put a flyer out for Trollers Fleming, a person of interest; is that correct?
A: That is correct.
Q: Was there any other person of interest that you were interested in speaking with at that point?
A: At that point, I had no information to lead me on to additional people of interest, no.
Q: So, it was just Trollers Fleming at that point?
A: At that point, yes.
5 RP at 621.
¶ 13 During discussions on jury instructions, Fleming's counsel initially proposed that the court instruct on the lesser included offenses of first and second degree manslaughter, but he withdrew this request after discussing the issue with Fleming. The trial court instructed the jury on the lesser included offense of second degree murder, and it agreed to give Fleming's proposed instruction on voluntary intoxication. The jury also received special verdict forms to find whether Fleming was "armed with a firearm" when he committed the crime. CP at 58, 60.
¶ 14 The jury found Fleming guilty of second degree murder while armed with a firearm. Fleming now appeals.

ANALYSIS
I. FIREARM ENHANCEMENT
¶ 15 Fleming argues that his firearm enhancement was improper because the legislature has not set out a procedure for alleging and submitting to a jury the issue of whether the defendant was armed with a firearm, as it has for the issue of whether the defendant was armed with a deadly weapon. See RCW 9.94A.602. According to Fleming, without an enacted procedure, the trial court and the appellate court lack the power to create a procedure.
¶ 16 Fleming did not object to the trial court's special verdict procedure. Ordinarily, we do not address issues raised for the first time on appeal. RAP 2.5(a); State v. McFarland, 127 Wash.2d 322, 332-33, 899 P.2d 1251 (1995). However, illegal or erroneous sentences may be challenged for the first time on appeal. State v. Ford, 137 Wash.2d 472, 477, 973 P.2d 452 (1999).
¶ 17 Fleming misreads RCW 9.94A.602, which authorizes a procedure by which a trial court may submit to the jury the question of whether the defendant was armed with any deadly weapon. We reject Fleming's assertion that this statutory procedure only applies to non-firearms. The statute's list of per se deadly weapons specifically includes firearms.[2] When the legislature authorized the trial court to submit the deadly weapon question to the jury, it did not limit the court's authority to submit to the jury any *610 question about the specific deadly weapon the defendant may have used.
¶ 18 We hold that, when submitting the deadly weapon question to the jury, the trial court has discretion to word the special verdict form using the "deadly weapon" language, the "firearm" language, or any other wording that carries out the spirit and purpose of the deadly weapon statute and the evidence presented at trial supports. Fleming has not shown legal error; his firearm enhancement was properly imposed.
¶ 19 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: ARMSTRONG, P.J., and QUINN-BRINTNALL, J.
NOTES
[1] We use Jasmine Shabazz's first name to avoid confusion. We mean no disrespect.
[2] RCW 9.94A.602 states as follows: "For purposes of this section, a deadly weapon is an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death. The following instruments are included in the term deadly weapon: . . . any dirk, dagger, pistol, revolver, or any other firearm . . ."